# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ALAN MAY, as Personal
Representative of the Estate of JESUS
WINSTON GILLARD, deceased,

      Plaintiff,

v.

                                        Case No. 11-14453

TOWNSHIP OF BLOOMFIELD, et al.,

      Defendants.

_____/

## OPINION AND ORDER (1) GRANTING TOWNSHIP OF BLOOMFIELD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING IN PART AND DENYING IN PART CITY OF TROY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jesus Gillard was seen purposefully attacking and repeatedly ramming his van into vehicles on Interstate 75, and numerous police officers from the Township of Bloomfield and the City of Troy responded to 911 calls, resulting in Gillard leading the officers on a high-speed chase which ended only when he drove headlong into one final vehicle. After assaulting and fighting with several of the responding police officers, and mightily resisting all attempts to arrest him, Gillard was eventually handcuffed and subdued, lying face down on the pavement. At some point while the ambulances were on their way to the scene, Gillard stopped breathing. Neither the police nor the paramedics were able to resuscitate him, and Gillard was pronounced dead at the hospital.

Gillard's Estate sued the ten police officers involved in the incident, the Township of Bloomfield, and the City of Troy for violations of Gillard's Fourth, Eighth, and Fourteenth Amendment rights.  Both municipalities and their respective officers move for summary judgment.  The two motions are fully briefed, and a hearing is unnecessary.  *See* E.D. Mich. LR 7.1(f)(2).  For the following reasons, the court will grant the Township of Bloomfield Defendants' motion for summary judgment.  The City of Troy Defendants' motion for summary judgment will be granted in part, that is, with respect to every claim except the allegation that Officer Sean Morse violated Gillard's Fourth Amendment right to be free from excessive force by kneeling on Gillard after Gillard was handcuffed, in a prone position, and no longer resisting arrest.  As to that discrete claim, as to one named Defendant, the motion fails.

## I. BACKGROUND[1]

In the evening on November 19, 2009, Michigan State Police began receiving 911 calls about a Dodge Ram van heading northbound on Interstate 75 that was purposefully tailgating and rear-ending other vehicles.  Jesus Gillard, the van's driver, repeatedly hit randomly selected vehicles, even those that transported children, upwards of seven to eight times.  If a vehicle changed lanes, Gillard would follow it and continue his assault.  Gillard drove through a construction zone with his lights off and got construction barrels wedged underneath his van.  Upon seeing Gillard drive through the construction zone, Tom Trice, the Director of Public Works for Bloomfield Township,

---

[1] Except where specifically noted, there are no material factual disputes.

2

followed Gillard into a gas station, pulled the barrels out from underneath the van, and asked Gillard if everything was ok.  Gillard responded by punching him.

Bloomfield Township dispatched officers Scott Monkkonen, April Switala, James Gallagher, and James Shoemaker to assist with the traffic crashes.  Shoemaker located Gillard at the gas station and approached with his emergency lights on.  But when he got out of the patrol car, Gillard dropped the gas pump and re-entered his van. Shoemaker identified himself as a police officer and yelled at Gillard to stop, but Gillard ignored the command and drove north on Woodward Avenue.  Shoemaker and Switala each pursued Gillard up Woodward.  At one point, Gillard put his van into reverse and accelerated into the front of Shoemaker's car before changing directions and proceeding south on Woodward.  The chase continued at 50-60 mph, and at times reached 70 mph.

In his effort to evade the Officers, Gillard hit a civilian vehicle, ran a red light at the intersection of Big Beaver Road and Woodward, and changed his direction a second time by driving through the median on Woodward and turning north. Monkkonen joined Switala and Shoemaker in pursuing Gillard.  Gillard was weaving through traffic and drove over the right curb in order to get around slower vehicles.  He then turned east onto Big Beaver but drove into a shallow ditch.  Shoemaker positioned his vehicle close to Gillard's in an attempt to block him from proceeding further, but Gillard reversed his van into Shoemaker's for a second time and drove through the ditch.  After driving another block and a half, Gillard reversed his van into Shoemaker's vehicle for a third time and continued eastbound on Big Beaver.  In running another red light, Gillard struck a SUV and the collision disabled his van, forcing the van to come to

3

a stop.  City of Troy police officer Sean Morse heard of the car crash over the radio and informed his police station, who then dispatched Troy police officers Morse, Michael Giordano, Christina Giovanni, and Michael Meinzinger to the scene of the crash.

Shoemaker, Switala, and Monkkonen, joined now by Bloomfield police officer Sean Kelley, positioned their cars so that Gillard could not flee.  Switala approached Gillard and yelled at him to get down on the ground.  Gillard, who was 6' 1" and 235 pounds, punched her in the face, hit her upper chest, and pinned her against the van by her throat.  Gillard attempted to punch her for a third time, but Switala ducked and avoided the strike.  Shoemaker deployed his Taser in probe mode, but the probes stuck to Gillard's coat and he did not react.  Shoemaker tased Gillard a second time, but Gillard remained unaffected.  Shoemaker then used his baton to strike the upper part of Gillard's right leg.  Gillard did not react to the strike except to direct his attention toward Shoemaker.  Gallagher arrived at the scene and, upon witnessing Gillard's resistance, called for backup.

Switala attempted to grab Gillard from behind but Gillard successfully pulled away and continued to throw punches at the Officers who tried to control him.  Switala tased Gillard in probe mode, but he again did not respond to the Taser.  Kelley then twice struck Gillard's right thigh with a baton, but Gillard refused to obey the Officers' commands to get down on the ground.  Shoemaker also struck Gillard with a baton, but the baton strikes did not appear to affect Gillard other than by causing him to direct his punches and resistance to whichever Officer delivered the strike.  When Monkkonen approached the scene, Gillard lunged at him.  In response, Monkkonen struck Gillard with a baton twice on his right wrist or forearm.  As Gillard continued his advance,

4

Monkkonen struck him in the left leg with his baton.  Recognizing that the Bloomfield Officers were unable to control Gillard, Morse tased Gillard ten times over the course of one minute and twenty-one seconds, but Gillard was unaffected by the Taser deployments.

By this point, the fight had moved from Gillard's van to behind Kelley's patrol car. While the Officers attempted to grab Gillard and push him against the patrol car, Gillard thwarted their attempts by throwing off the Officers.  Whether it was because Gillard tripped or because an Officer pushed him, Gillard fell to his knees.  Switala and Gallagher tried to hold Gillard on the ground, and Switala hit Gillard with her baton to make him comply with the Officers' commands, but Gillard avoided their control by continuing to pull away and swing at them.  Switala claims that Gillard grabbed for her Taser holster, which looks similar to a gun holster, causing Switala to exclaim to the other Officers that Gillard was reaching for their guns.  Switala claims that she saw Gillard reach for another Officer's gun and struck his arm with a baton.  Gillard was not, however, ever able to gain possession of any Officer's weapon.

Gillard arose from his knees and moved towards the driver's side of Kelley's car, all the while ignoring the Officers' commands to surrender and resisting the Officers' attempts to subdue him by throwing punches and moving his arms.  Around this time, Morse informed Troy dispatch that the scene was not secure and requested dispatch to send another Officer with a Taser.  The driver's side door of Kelley's car was open and the engine was running.  Gillard attempted to get into the driver's side seat and successfully maneuvered one of his legs inside the car.  Switala grabbed Gillard to stop him from fully entering the vehicle and, with the assistance of Shoemaker and Kelley,

5

pulled Gillard out of the car. Once outside of the car, Gillard continued to throw punches.[2] Monkkonen tased Gillard twice in the chest, and Gillard began to slide against the car to the ground. Kelley pulled Gillard down to a seated position, but Gillard still reached for the car's door handle and continued to wildly swing his arms from the seated position.

When Gillard was in a seated position, Monkkonen attempted to handcuff him. Monkkonen put one handcuff on Gillard's left wrist, but Gillard yanked his arm away with extreme force such that Monkkonen let go of the handcuff before securing Gillard's right wrist. The Officers perceived Monkkonen as having a loose handcuff that he could swing and use as a weapon. The Officers continued to try and grab Gillard's arms, but each time he pulled them away.

Troy Officers Meinzinger and Giordano arrived seconds after Monkkonen's failed attempt to handcuff Gillard. Meinzinger claims that, before arriving at the scene, he had heard Morse's request for another Taser and that the scene was not secure. When Meinzinger exited his vehicle, he alleges that someone yelled "Tase him," and Meinzinger complied by tasing Gillard three times in fourteen seconds. Morse testified

_____

[2] The Estate disagrees with the testimony that Gillard was throwing punches, but presents only Giordano's in-car video (the "Giordano video") to argue that when the Troy Officers arrived, Gillard was leaning against Kelley's patrol car with his arms at his side, apparently winded. However, the Giordano video's first footage of the incident begins a few seconds before Meinzinger exits his vehicle and applies the Taser to Gillard. The Giordano video does not depict the Officers pulling Gillard out of Kelley's car, Monkkonen tasing Gillard, or Monkkonen attempting to handcuff Gillard—all of which happened just before Meinzinger arrived and tased Gillard. Therefore, the Giordano video does not support the Estate's contention that Gillard was not throwing punches immediately after being removed from Kelley's patrol car. The Officers' offer uncontroverted testimony that he was doing so, while the Estate offers mere argument.

6

that he was the Officer who directed Meinzinger to tase Gillard.  The Estate alleges that,

as seen in the Giordano video, multiple patrol cars had their sirens on and Meinzinger

immediately exited his vehicle, ran toward Gillard, and deployed his Taser.  Thus, the

Estate claims that Meinzinger did not have the time or ability to hear another Officer yell

"Tase him."

After Meinzinger deployed his Taser, Kelley pulled Gillard onto the ground into a

prone position.  The Officers tried to handcuff him, but Gillard's arms were underneath

his body.  The Estate claims that Gillard did not maneuver his arms underneath him, but

rather that the Officers dragged Gillard onto his arms.  Switala restrained Gillard's left

leg with her heel, and Gallagher administered knee strikes in the hope that Gillard would

release his arms from underneath his body.  Meinzinger yelled at Gillard to put his

hands behind his back and attempted to grab Gillard's left arm.  Meinzinger denies

putting any pressure on Gillard's back during this process.

The Estate disputes that Meinzinger attempted to pull Gillard's arm from

underneath him and instead claims that Meinzinger only leaned on Gillard while striking

him.  According to the Estate, Meinzinger used his foot to put pressure on Gillard and,

at one point, Meinzinger lifts his other foot off of the ground, thereby shifting his entire

body weight onto Gillard.  The Estate further disagrees that Gillard resisted Meinzinger's

attempt to handcuff him and argues that, due to the chaotic environment and multiple

Officers placing pressure on his back, Gillard was unable to hear the verbal commands

or release his arms.

Gallagher testified that Gillard tried to push himself off of the ground, and that

Gallagher responded by placing his knee on Gillard's right shoulder in order to keep him

7

pinned down.  The Estate disputes that Gillard attempted to push off of the ground, but rather claims that he was "thrashing around" because his breathing was constricted. Gillard was moving his torso during this time, and the Estate alleges that Gillard did so in order to regain his breath.  Bloomfield police officer Jason Murphy arrived at the scene and took over Gallagher's position.  Gallagher left the fight scene and used Shoemaker's patrol car to ask dispatch to send emergency medical services.

The Officers attempted to secure Gillard's arms, but Gillard continued to pull his arms away.  Giordano kneeled on Gillard's left hamstring and held down Gillard's left leg.  The Estate alleges that Morse used one leg to put pressure on Gillard and that, at one point, both of Morse's legs were off of the ground such that all of his weight was transferred to Gillard.  In an effort to make Gillard comply, Shoemaker tased Gillard in his lower back, but the Taser deployment was ineffective as Gillard continued to evade the Officers' attempts to secure him.  Giovanni claims that she heard someone yell "Tase him again."  Giovanni tased Gillard in his left calf twice within fifteen seconds. Murphy gained control of Gillard's right arm, but Gillard tired to pull away.  Murphy was able to hold on to Gillard's arm, and the other Officers handcuffed Gillard using four sets of handcuffs.  Monkkonen then made a second request for medical services, this time asking that two ambulances be sent.  Throughout the ordeal, the Officers yelled commands at Gillard such as "Stop fighting!  Stop resisting!  Get on the ground!" Defendants claim that Gillard never complied with these orders; the Estate does not contest the non-compliance, but theorizes that Gillard could not hear the instructions because of the chaotic environment and argues further that he was physically unable to comply because multiple Officers were applying pressure to his body.

8

Defendants allege that after Gillard was handcuffed and restrained, no Officer put any pressure on Gillard who was lying face down and partly on his left side. Morse testified that he monitored Gillard and could hear him breathing. In monitoring Gillard, Morse placed both of his knees on Gillard's left shoulder, but stresses that all of his weight was on the balls of his feet such that he was not exerting any pressure on Gillard. The Estate argues that the Giordano video shows otherwise. According to the Estate, a number of Officers continued to place pressure on Gillard after he was restrained, though the only Officer that the Estate identifies by name is Morse. The Estate alleges that Morse placed substantial pressure on Gillard's back and shoulder area by kneeling on him. Further, the Estate argues that Gillard was lying face down and not turned on his side to any extent.

Approximately three minutes later, Sergeant Frank Nastasi[3] of the Troy Police Department arrived. Morse informed Nastasi that Gillard's right leg was injured and that he was concerned that moving Gillard would exacerbate the injury. Nastasi attempted to communicate with Gillard who did not respond. A voice is heard asking, "Is he breathing?" Gillard was then turned onto his side, but it was apparently unclear if he was breathing. Even though ambulances were on the way, Nastasi ran to obtain a medical bag and directed the other Officers to do the same and begin treating Gillard. Two ambulances arrived and the paramedics checked for Gillard's pulse, began chest compressions, and transported Gillard to the hospital. The paramedics could not resuscitate Gillard who was pronounced dead at the hospital. The Oakland County

---

[3] Nastasi was promoted to "Lieutenant" in 2012, but held the rank of "Sergeant" at the time of the incident.

Medical Examiner's Office performed an autopsy and concluded the cause of death was "position/compression asphyxia" with acute psychosis as a contributory cause.

Gillard had suffered from mental illness since the 1970s.  He was hospitalized several times, diagnosed with schizophrenia, and noted to be violent and to exhibit bizarre behavior.  In the years preceding his death, he was diagnosed with bipolar disorder and prescribed lithium.  Gillard's doctors lowered his lithium dosage prior to the incident, and the lower dosage had been negatively impacting his behavior.

In October 2011, Plaintiff Alan May, as the Personal Representative of the Estate of Jesus Gillard, filed suit against Bloomfield Officers Gallagher, Kelley, Monkkonen, Murphy, Shoemaker, and Switala; Troy Officers Meinzinger, Morse, Giovanni, and Giordano; the Township of Bloomfield; and the City of Troy.  The Estate alleges 42 U.S.C. § 1983 claims against the Defendant Officers for violating Gillard's Fourth Amendment right to be free from excessive force; Fourteenth Amendment right to substantive due process, adequate medical treatment, and equal protection; and Eighth Amendment right to be free from cruel and unusual punishment.  The Estate also alleges 42 U.S.C. § 1983 claims against the Township of Bloomfield and the City of Troy for failing to properly train, supervise, and discipline the Defendant Officers, as well as for failing to hire Officers that would not endanger the public.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must first show the absence of a genuine issue of material fact.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929,

10

934 (6th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The

burden then shifts to the non-moving party, who "must do more than simply show that

there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The non-moving party must put forth enough evidence to show that there exists a

genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  "[T]here is no issue for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party.  If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

Summary judgment is not appropriate when "the evidence presents a sufficient

disagreement to require submission to a jury."  *Id.* at 251-52.  When deciding summary

judgment motions, "the court must view the evidence in the light most favorable to the

non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v.*

*United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Electric Indus. Co.*,

475 U.S. at 587).  The court does not weigh the evidence to determine the truth of the

matter, but rather to determine if the evidence creates a genuine issue for trial.  *Sagan*,

342 F.3d at 497 (quoting *Anderson*, 477 U.S. at 249).

### III. DISCUSSION

#### A. Qualified Immunity

The Officers may only be held liable for damages under § 1983 if they are not

entitled to qualified immunity.  Qualified immunity is "an immunity from suit rather than a

mere defense to liability."  *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citation and

11

emphasis omitted).  The privilege protects government officials from civil damages when actions performed in their official capacity "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  The court employs a two-step inquiry in determining whether a government official is entitled to qualified immunity: (1) whether the official's conduct violated a constitutional right when considering the facts in a light most favorable to the injured party; and (2) whether the constitutional right was "clearly established."  *Saucier*, 533 U.S. at 201.  Deciding whether government officials are entitled to qualified immunity "is purely a question of law for the district court."  *Poe v. Haydon*, 853 F.2d 418, 424 (6th Cir. 1988).

**B. Fourth Amendment Claim**

i. Violation of a Constitutional Right

A claim for excessive force is analyzed under the Fourth Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 389 (1989).  The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (citations omitted).  Applying the "objective reasonableness" standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  The "objective reasonableness" standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force

12

necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (citing *Graham*, 490 U.S. at 396).

The Estate argues that the Officers began using excessive force when Gillard was allegedly subdued and no longer resisting arrest. When a suspect is actively resisting arrest, police officers do not violate the Fourth Amendment by administering force, such as Taser deployments or baton strikes, to subdue the suspect. *See, e.g.*, *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 97 (6th Cir. 2012) (officers used reasonable force in tasing a suspect who actively resisted arrest by keeping his arms underneath his body and refusing to be handcuffed); *Williams v. Sandel*, 455 F. App'x 353, 363 (6th Cir. 2011) (officers did not use excessive force when they subjected an actively resisting suspect to baton strikes, pepper spray, and thirty-seven Taser deployments). On the other hand, the use of force has been found to be excessive when a suspect is cooperative or no longer resisting arrest. *See, e.g.*, *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (officers violated the Fourth Amendment by tasing a suspect who was not resisting arrest); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (officers used excessive force on a handcuffed suspect who was not resisting arrest when the officers sprayed the suspect with pepper spray and placed substantial pressure on his back while in the prone position).

According to the Estate, Gillard was no longer resisting arrest after Monkkonen failed to handcuff him and Gillard was leaning against Kelley's patrol car. Gillard's conduct, and whether he was resisting arrest, is a significant factor in determining whether the Officers used excessive force. That conduct varied and allows the incident to be divided into three phases: (1) Gillard leaning against Kelley's patrol car before

13

being placed into the prone position; (2) Gillard in the prone position before being handcuffed; and (3) Gillard in the prone position after handcuffing. The reasonableness of the Officers' use of force at each phase will be analyzed separately.

*a. Gillard Before Being Placed in the Prone Position*

The Estate claims that Meinzinger used excessive force by tasing Gillard three times while Gillard was resting against Kelley's patrol car. The Estate argues that, at the moment Meinzinger tased Gillard, the Giordano video shows Gillard leaning against Kelley's patrol car, no longer resisiting arrest or threatening the Officers. Even accepting the Estate's version of the facts, it is undisputed that Gillard was actively resisting arrest just moments before Meinzinger arrived. Gillard had just attempted to enter Kelley's patrol car with its engine running, forcing the Officers to pull him out so that he could not drive away. Gillard then evaded the Officers' attempts to handcuff him by wildly swinging his arms. When Monkkonen placed a handcuff on Gillard's left wrist, Gillard yanked his arm away, leading the Officers reasonably to conclude that he could now use the handcuff as a weapon. Gillard continued to pull his arms away from the Officers who tried to restrain him. Meinzinger arrived only seconds after these events.

The fact that Gillard was not attacking any Officers at the precise moment Meinzinger tased him does not render Meinzinger's action unreasonable. Gillard had already demonstrated that he was a severe threat to the public and the Officers after he purposefully rammed his van into automobiles, struck a civilian at a gas station, led the Officers on a high-speed chase that resulted in automobile accidents, punched Switala and pinned her by her throat against a van, and actively resisted the Officers' numerous attempts to subdue him. It is undisputed that Gillard was not fully handcuffed or

14

otherwise restrained when Meinzinger approached.  Given Gillard's violent behavior
during the evening, it was not unreasonable for Meinzinger to think that Gillard still
posed an immediate safety threat to the Officers.

Further, Meinzinger was notified by the Officers already on the scene that Gillard
should be tased.  While driving toward the scene, Meinzinger heard from Morse that
Gillard was not secure and that another Taser was needed.  Upon arriving and getting
out of his vehicle, Meinzinger testified that he heard someone yell "Tase him," and
Morse testified that he was the Officer who gave the command.  The Estate argues that
there is a question of fact whether Meinzinger heard Morse yell "Tase him."  There is
not.  The Estate argues that the Giordano video shows Meinzinger immediatley tase
Gillard upon exiting his vehicle and that several police cars had their sirens blaring.
Thus, the Estate contends that Meinzinger did not have the time or ability to hear Morse
direct Meinzinger to tase Gillard.  This argument, however, is based on pure conjecture.
"In order to survive a motion for summary judgment, the non-moving party must be able
to show sufficient probative evidence that would permit a finding in his favor on more
than mere speculation, conjecture, or fantasy."  *Lewis v. Philip Morris Inc.*, 355 F.3d
515, 533 (6th Cir. 2004) (citation and alterations omitted).  The Estate has not offered
any actual evidence that contradicts Meinzinger's sworn testimony that he heard Morse
request a Taser—both before arriving at the scene and upon exiting his vehicle.

It cannot be reasonably disputed that Gillard had presented a potentially lethal
danger to the public and a continuing dangerous menace to the Officers.  On his way to
the scene, Meinzinger heard a request for a Taser deployment and that Gillard was not
restrained.  When he exited his vehicle, he saw that Gillard was not handcuffed, heard a

15

second request for a Taser, and deployed his Taser into Gillard's chest.  In determining

whether an officer's conduct was reasonable, the court must allow "for the fact that

police officers are often forced to make split-second judgments—in circumstances that

are tense, uncertain, and rapidly evolving—about the amount of force that is necessary

in a particular situation."  *Graham*, 490 U.S. at 396-97.  Given these circumstances,

Meinzinger's decision to tase Gillard was not objectively unreasonable.[4]

### b. Gillard in the Prone Position Before Being Handcuffed

After Meinzinger tased Gillard, Kelley pulled Gillard into the prone position on the

ground and the Officers attempted to handcuff him.  The Officers allege that Gillard

resisted being handcuffed and, consequently, they used force to make him comply.

Accepting the Estate's version of the facts, the Officers tased Gillard multiple times,

administered strikes to his body, and applied substantial pressure to his back, shoulder,

and legs.  The Estate argues that all of the force used during this time was

unreasonable because Gillard was subdued in the prone position and no longer

resisting arrest.

While the parties dispute some of what happened during this portion of the

incident, there are key facts to which both agree: Gillard's arms were underneath his

body while the Officers tried to handcuff him, (Dk. # 79 at Pg 14 ¶ 66); Shoemaker

tased Gillard's lower back for pain compliance but the Taser deployment was not

effective and Gillard continued to resist the Officers' efforts to handcuff him, (Dkt. # 64

---

[4] Indeed, given the circumstances at several points in the confrontation, a degree
of force substantially greater than a Taser shock might well have been justifiable.  *See,
e.g., Williams v. City of Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007); *Dudley v.
Eden,* 260 F.3d 722 (6th Cir. 2001); *Scott v. Clay County,* 205 F.3d 867 (6th Cir. 2000).

16

at Pg 21 ¶ 71; Dkt. # 79 at Pg 15 ¶ 71); when Murphy gained control of Gillard's right arm, Gillard tried to pull his arm away, (Dkt. # 64 at Pg 21 ¶ 72; Dkt. # 79 at Pg 15 ¶ 72); Gillard "thrash[ed] around," (Dkt. # 78 at Pg 19 ¶ 71), moved his torso, (Dkt. # 78 at Pg 17 ¶ 62), and "wriggle[d] and move[d]" while in the prone position, (Dkt. # 79 at Pg 37). The Officers considered Gillard's actions to constitute resistance and continuously yelled "Stop fighting!  Stop resisting!"

The Estate argues that Gillard's violent conduct was not an effort to resist. In fact, according to the Estate, Gillard was essentially passive, and his arms were underneath his body because he was dragged onto them. The Estate speculates that his arms stayed underneath his body only because the Officers pushed and pulled him in different directions. Even though Gillard thrashed and moved as the Officers attempted to handcuff him, argues the Estate, he did so only because his breathing was constricted and he was trying to allow air into his lungs.

While it is, perhaps, plausible to argue that Gillard was, at some point, no longer subjectively attempting to resist arrest or fight, "[t]he reasonableness of a particular use of force must be judged *from the perspective of a reasonable officer on the scene,* rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (emphasis added). Nor, of course, is the reasonableness of the force to be judged from the perspective of the very person who appears to be resisting. It is undisputed that, by this time, Gillard had long been actively resisting arrest, beginning when he led the police on a dangerous and destructive high-speed highway chase. There is no rational dispute about the things Gillard was doing, and it was nothing short of reasonable for the Officers to view Gillard as continuing to resist arrest when, in a prone position with his

17

arms underneath his body, he tried to pulled his arm away from Murphy's control and continued to "thrash[] around." Furthermore, "[t]he essence of qualified immunity . . . is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). Any reasonable officer with knowledge of the background circumstances and who was attempting to restrain Gillard could view Gillard's actions as a continuation of his attempts to resist capture and arrest. The use of force was objectively reasonable. It did not violate the Fourth Amendment.

### c. Gillard in the Prone Position After Being Handcuffed

Once Gillard was placed in handcuffs and subdued, he was not tased or struck by another Officer. However, the Estate claims that Morse remained kneeling on Gillard's back, using both of his knees, for approximately three minutes until Nastasi arrived. In doing so, the Estate argues that Morse put substantial pressure on Gillard's back. Morse testified that, while he placed his knees on Gillard's left shoulder, all of his weight was on the balls of his feet such that he did not exert any pressure on Gillard. (Dkt. # 78-5 at Pg 29-30.) The Giordano video shows Morse kneeling at Gillard's back, touching Gillard, but it is unclear how much pressure is being exerted. Morse may well be correct; the video can readily be interpreted as supporting Morse's contention that he kept most or all of his weight off Gillard's back. But, a reasonable juror could study the video and differ with Morse, concluding that he kneeled on Gillard with substantial—and objectively unreasonable—pressure, and that the pressure was maintained for a longer time—objectively and unreasonably longer—than was appropriate. Placing substantial

18

pressure on the back of a suspect laying face down constitutes excessive force because it restricts the suspect's breathing and creates a risk of asphyxiation. *Champion v. Outlook Nashville, Inc.*, 280 F.3d 893, 903 (6th Cir. 2004) ("Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable force.")  If Morse used excessive pressure, *i.e.*, more pressure than was reasonably needed to maintain control and keep Gillard subdued, a Fourth Amendment violation can be supported.

Viewing the facts and an interpretation of the video evidence most favorably to the Estate, a jury could conclude that Morse violated Gillard's Fourth Amendment right to be free from excessive force by kneeling on Gillard with unnecessary weight and for an unnecessarily long time, thereby placing substantial pressure on Gillard's ability to breathe, all while Gillard was handcuffed, subdued, quiet, and therefore no longer dangerously resisting.  The court emphasizes that both elements, the application of excessive pressure and for an excessively long duration, would be required to be proved in order to make out a Fourth Amendment violation in these circumstances. Insignificant pressure, no matter how lengthy, does no violence.  Great weight, applied for only a *de minimus* length of time, would not constitute excessive force.  Together, though, it is known that the combination can result in death.

### d. Secondary Liability of Other Officers

While no other Officer placed any pressure on Gillard after he was handcuffed, one or more of the fellow Officers can still be held liable for failing to protect Gillard from excessive force of which they were aware.  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir.

19

1997).  "[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Id.*

After Gillard was handcuffed, Kelley was transported to the hospital to receive treatment for injuries suffered in the fight.  (Dkt. # 64-13 at Pg 11.)  Gallagher, Monkkonen, Murphy, Shoemaker, Switala, Meinzinger, Giovanni, and Giordano remained at the scene.  The Giordano video shows those Officers in fairly close proximity to Morse and Gillard, waiting for medical care to arrive.  Yet neither the Giordano video nor any other evidence shows that any of these Officers saw or had any reason to know that Morse was in the process of putting dangerous or substantial pressure on Gillard.  Morse is seen kneeling beside Gillard with his feet on the ground and knees touching Gillard's back.  Even if it were to be later accepted as fact that Morse was exerting substantial pressure in kneeling there, his position and acts—to the extent that he "acted" at all other than simply remaining still—did not rise to an appearance of the infliction of pain or punishment on a subdued individual, or anything resembling a gratuitous application of force upon a helpless arrestee.  Based upon the Giordano video, there was nothing to be seen that was alarming, violent, unusual, or out of the ordinary, and therefore nothing from which a reasonable inference could be drawn by an observing fellow officer that excessive force was being used.  *Cf. Landis v. Baker*, 297 F. App'x 453, 460-61 (6th Cir. 2008) (police officer used excessive force by kneeling on a subdued suspect's back while the suspect's face was submerged in nearly one foot of water); *Champion v. Outlook Nashville, Inc.*, 280 F.3d 893, 901 (6th

20

Cir. 2004) (police officers used excessive force by laying on top of a handcuffed suspect who was on his stomach in the prone position).  The Estate has pointed to no evidence that suggests the Officers observed or had reason to know that Morse was using excessive force with his feet both on the ground and only his knees in some degree of contact with Gillard's back.  *Cf. Landis*, 297 F. App'x at 463-64 (officers observed excessive force being used when they witnessed a fellow officer administer baton strikes and Taser deployments to a non-resisting suspect).  Accordingly, Gallagher, Monkkonen, Murphy, Shoemaker, Switala, Meinzinger, Giovanni, and Giordano did not violate Gillard's Fourth Amendment rights by failing to intervene between Morse and Gillard.

### ii. Clearly Established Right

Morse is entitled to qualified immunity if the constitutional right violated was not "clearly established" at the time of the incident.  *Hagans*, 695 F.3d  at 508.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202 (citation omitted).  To determine whether a right is clearly established, the court must first look to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within the circuit, and finally to decisions in other circuits.  *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 579 (6th Cir. 1997).  The unlawfulness of an action "can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs."  *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

21

The constitutional right must be "reasonably particularized" and not defined either too broadly or narrowly. *Hagans*, 695 F.3d at 509. Defining the right at issue "at the appropriate level of generality," *id.*, the question is whether it was clearly established in November 2009 that a police officer should not place substantial pressure on a suspect's back who is in the prone position and no longer resisting arrest. Before the incident with Gillard, the Sixth Circuit in *Champion v. Outlook Nashville, Inc.*, 280 F.3d 893 (6th Cir. 2004), held that such a right existed and was clearly established. The court found that it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 903. In light of *Champion*, a reasonable officer should know that he must avoid placing on a person's back substantial pressure so as to constrict the breathing of a person in a prone position and not resisting arrest. The right at issue was clearly established some years before November 2009. Therefore, Morse is not entitled to qualified immunity on the claim that he violated Gillard's Fourth Amendment right by kneeling with excessive pressure on Gillard after Gillard was handcuffed.

It is not entirely clear whether the Estate also argues that the Officers used excessive force on Gillard after he was handcuffed by simply leaving him in the prone position or by placing any degree of pressure on his back. Even if the Estate so contends, the claim fails because there is no right inhering in a subdued suspect to not remain in a prone position or to be free from insubstantial or incidental pressure,

certainly none clearly established in November 2009.[5]  After finding that it was clearly

established that an officer may not place substantial pressure on a subdued suspect's

back, the Sixth Circuit in *Champion* explained:

> This appeal gives us no cause to consider whether leaving a bound suspect
> on his or her stomach without more constitutes excessive force that violates
> a suspect's clearly established Fourth Amendment rights.  This is neither a
> "positional asphyxia" case nor a case in which the officers lightly touched or
> placed incidental pressure on [the suspect's] back while he was face down.

*Champion*, 280 F.3d at 903.  No Sixth Circuit decision has since addressed those

questions.  The plaintiff bears the burden of showing that a right was clearly established

at the time of the incident, *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009), but the

Estate does not direct the court to any case that clearly establishes any such right.

Accordingly, summary judgment is warranted on the claim that the Officers used

excessive force on Gillard after he was handcuffed simply by leaving him in the prone

position and placing or allowing incidental pressure on his back.

### C. Fourteenth Amendment Claims

The Estate alleges that the Officers violated Gillard's Fourteenth Amendment

rights to substantive due process and equal protection.

### i. Substantive Due Process

The Due Process Clause of the Fourteenth Amendment states that "no[] . . .

State [shall] deny any person of life, liberty, or property without due process of law."

U.S. Const. amend. XIV, § 1.  The Estate claims that the Officers violated Gillard's

---

[5] The court may exercise its discretion "in deciding which of the two prongs of the
qualified immunity analysis should be addressed first in light of the circumstances in the
particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

23

substantive due process rights by using excessive force and displaying deliberate indifference to his medical needs.

### a. Excessive Force

"[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citation and alterations omitted).  Claims that police officers used excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard, rather than under a 'substantive due process' approach."  *Graham*, 490 U.S. at 395.  It is undisputed that Gillard was "seized" during the incident.  The Estate's excessive force claim was properly analyzed under the Fourth Amendment and will be dismissed as a matter of law to the extent that it is alleged under the Fourteenth Amendment.

### b. Medical Treatment

The Estate alleges that the Officers were deliberately indifferent to Gillard's medical needs.  The Due Process Clause of the Fourteenth Amendment affords pretrial detainees "a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners."  *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  To establish a § 1983 claim for failure to provide medical treatment, a plaintiff must show that the government official acted with "'deliberate indifference to serious medical needs.'"  *Watkins*, 273 F.3d at 686 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104

24

(1976)).  A government official demonstrates deliberate indifference when he knows of and disregards an excessive risk to a plaintiff's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  To establish that a government official was deliberately indifferent to a serious medical need, the plaintiff must show: (1) "the existence of a sufficiently serious medical need" and (2) that the government official "possessed a sufficiently culpable state of mind in denying care."  *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009) (citation omitted).

A medical need is "sufficiently serious" if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (citations omitted).  The Estate argues that Gillard was at risk of positional asphyxia, which satisfies the obviousness standard.  As noted earlier, the court will view the evidence most favorably to the Estate and accept its version of the facts: after physically exerting himself in his struggle with the Officers and suffering numerous Taser deployments, Gillard, who was 6' 1" and 235 pounds, was face down on the ground, with his arms handcuffed behind his back, for approximately three minutes until Nastasi arrived and turned him onto his side.  In such a situation, a layperson would recognize that Gillard was at risk of asphyxiating.  Indeed, Defendants do not dispute that Gillard's risk of positional asphyxia was a "sufficiently serious" medical need, but instead argue that the none of the Officers possessed a "culpable state of mind" in denying Gillard immediate treatment.

In order to have a "culpable state of mind," "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

25

exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  If the inference

is drawn, the official must then "recklessly disregard[] the risk." *Id.* at 836.

The Estate argues that the Officers were deliberately indifferent to Gillard's risk of

positional asphyxia.  The Estate alleges that the Officers knew that Gillard was at risk of

positional asphyxia because he had a large body type, physically exerted himself in his

fight with the Officers, and suffered multiple Taser deployments.  During the

approximatley three minutes between when Gillard was finally handcuffed and Nastasi

arrived, the Estate contends that the Officers ignored Gillard's risk of positional asphyxia

by not turning Gillard onto his side, checking his breathing, and administering CPR.

Whether the Officers possessed a "culpable state of mind" requires a subjective

test that "must be addressed for each officer individually." *Garretson v. City of Madison

Heights*, 407 F.3d 789, 797 (6th Cir. 2005).  The Estate, however, does not provide any

argument specific to each Officer.  Instead, the Estate refers to "officers" collectively by

asserting that "[a]ll of the officers testified that they knew about the risk factors of

positional asphyxia, and they admitted that they recognized that Mr. Gillard's body type

and the situation put him at an increased risk."  (Dkt. # 78 at Pg 56.)  Of the ten Officers

involved in the incident, the Estate directs the court to the testimony of only

four—Morse, Meinzinger, Giovanni, and Giordano—to establish that they knew that

Gillard was at risk of positional asphyxia.  While those Officers testified that they were

aware that the risk factors for positional asphyxia were present during the incident with

Gillard,[6] they never stated that they knew Gillard was at risk.  But an officer "may not

---

[6] Morse testified:
    Q: So is it your testimony that risk factors for a [sic] positional

26

'escape liability if the evidence showed that he . . . declined to confirm inferences of risk

_____

> asphyxia were present on November 19th, 2009, with regard
> to Jesus Gillard?
> A: Yes.  (Dkt. # 75-8 at Pg 28.)

Meinzinger testified:

> Q: Was it your understanding on the day of this incident that you are
> to monitor someone who is handcuffed behind their back laying in the
> prone position because there's a significant risk factor for positional
> asphyxia?
> A: Yeah, if they're in a prone position, you want to make sure that
> they're okay.  (Dkt. # 78-8 at Pg 20.)

Giovanni testified:

> Q: So it's your testimony that your training has instructed you on risk
> factors regarding positional and/or compressional asphyxia for
> someone who has just engaged in strenuous physical activity?
> A: Yes.  (Dkt. # 78-11 at Pg 22.)

Giordano testified:

> Q: And based upon your understanding of the risks for positional
> asphyxia on the date of this incident, did you feel that risk factors were
> present in Mr. Gillard for positional asphyxia?
> A: I'm not sure.  I don't know.
> Q: Were you unsure that day too?
> A: It's possible.  I don't know.
> Q: Did you not know whether or not risk factors were present on the
> date of the incident?
> A: I knew that there were risk factors.  To the extent of that, I couldn't
> tell you.
> Q: Did you know, at that point in time . . . that one of those risk factors
> was extensive and exhausting physical activity?
> A: Yes.
> Q: Did you think that Mr. Gillard had been involved in exhausting
> physical activity that day?
> A: Yes.
> Q: Were you aware that one of those risk factors is weight placed
> upon a person's back when they are in the prone position?
> A: Yes.
> Q: Were you aware that there was a risk factor for someone who was
> laying in prone position and handcuffed behind their back.
> A: Yes.
> . . .
> Q: Were you aware at that point that a Taser application also
> exacerbates risk factors for positional asphyxia?
> A: Yes.  (Dkt. # 78-14 at Pg 13.)

that he strongly suspected to exist.'" *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 843 n.8).  The testimony offered by Morse, Meinzinger, Giovanni, and Giordano creates a question of fact regarding whether those Officers, having recognized on the day of the incident that the risk factors for positional asphyxia were present, perceived that Gillard was at risk of positional asphyxia.

Morse, Meinzinger, Giovanni, and Giordano may be held liable if they acted with "deliberate indifference" towards Gillard's risk of positional asphyxiation.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "'Deliberate indifference' is a very high standard of culpability, *exceeding* 'gross negligence.'"  *Ross v. Duggan*, 402 F.3d 575, 590 n.7 (6th Cir. 2004) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-92 & n.7 (1989)).  The Officers must have "recklessly disregard[ed]" the risk of positional asphyxia, *Farmer*, 511 U.S. at 836, but will escape liability if they "'responded reasonably to the risk, even if the harm ultimately was not averted,'" *Comstock*, 273 F.3d at 706 (quoting *Farmer*, 511 U.S. at 844).

Pretrial detainees have "the right to have medical assistance summoned immediately upon the police officers becoming aware that [the pretrial detainee is] in need of immediate medical care."  *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097 (6th Cir. 1992).  When medical care is promptly summoned, a pretrial detainee's right to adequate medical treatment is not violated.  *Id.*  In *Estate of Owensby v. City of Cincinnati*, the court held that police officers violated a pretrial detainee's constitutional right to medical care when he suffered positional asphyxiation while being held in the back of a patrol car.  414 F.3d 596, 603 (6th Cir. 2005).  Even though the officers recognized that the pretrial detainee was physically injured and was possibly having

28

difficulty breathing, they "made no attempt to summon or provide any medical care until several minutes later." *Id.*

Unlike in *Owensby*, there is no dispute that the Officers in this case promptly summoned medical care for Gillard. Before Gillard was even handcuffed, Gallagher requested dispatch to send emergency medical services. (Dkt. # 64 at Pg 15 ¶ 68.) Once Gillard was restrained, Monkkonen made a second request for medical care and asked that two ambulances be sent. (Dkt. # 64 at Pg 23 ¶ 82; Dkt. # 64-4 Ex. C track 18:10:06.) Two ambulances were dispatched at 6:08 p.m. and 6:11 p.m., respectively, with the first one arriving at 6:13 p.m. (Dkt. # 69-24 at Pg 7, 9.)

The Estate argues that requesting medical care was insufficient to treat Gillard's risk of asphyxiation. Once Gillard was handcuffed, the Estate contends that the Officers should have immediately turned Gillard on his side, checked his breathing,[7] and administered CPR. But the Sixth Circuit has not imposed such a requirement upon police officers:

> The due process clause requires responsible governments and their agents to secure medical care for persons who have been injured while in police custody . . . . We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances . . . . Due process requires that police

---

[7] Morse testified that he monitored Gillard and did, in fact, hear him breathing. (Dkt. # 64-16 at Pg 2-3.) The Estate claims that the Giordano video shows Morse positioned on top of Gillard who is completely face down. When Nastasi had Gillard turned over, the Officers were uncertain whether Gillard was breathing. The Estate asserts that "[a] reasonable juror could . . . conclude that Officer Morse was not paying attention to whether Mr. Gillard was breathing and did not in fact hear him breath." (Dkt # 79 at Pg 17.) Whether Morse monitored Gillard's breathing may be a question of fact (although the Estate presents mere argument, pointing to no particular evidence in rebuttal). However, even if Morse did not do so, the Officers nonetheless were reasonable in their response to Gillard's risk of positional asphyxia.

> officers seek the necessary medical attention for a detainee when he or she
> has been injured while being apprehended either by promptly summoning the
> necessary medical help or by taking the injured detainee to a hospital.

*Rich*, 955 F.2d at 1097 (citing *Maddox v. City of L.A.*, 792 F.2d 1408, 1415 (9th Cir.

1986)).  Furthermore, the Officers had a principled basis for leaving Gillard in a prone

position.  Gillard's right leg was fractured, and when Nastasi arrived at the scene, Morse

informed him that Gillard had not been turned over so that the injury was not

exacerbated.  (Dkt. # 64-17 at Pg 5.)

The Officers reasonably responded to Gillard's risk of positional asphyxia:

Gillard's breathing was being monitored, at least to some extent, medical care had been

summoned even before Gillard was restrained, and the decision to leave Gillard prone

was out of a stated concern for his broken leg.  Such actions do not support a finding

that any Officer recklessly disregarded Gillard's risk of asphyxiation.  Accordingly, the

Officers did not violate Gillard's Fourteenth Amendment right to medical care.

<u>ii. Equal Protection</u>

The Equal Protection Clause of the Fourteenth Amendment guarantees

individuals "equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "To state a

claim under the Equal Protection clause, a § 1983 plaintiff must allege that a state actor

intentionally discriminated against the plaintiff because of membership in a protected

class."  *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990) (citation omitted).

A plaintiff cannot merely allege that he was treated unfairly as an individual, but rather

"that he was denied equal protection of the law based upon an unjustifiable standard

such as race, religion, or other arbitrary classification."  *Bass v. Robinson*, 167 F.3d

1041, 1050 (6th Cir. 1999) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

30

The Estate alleges broadly, but never specifies, to which protected class Gillard is supposed to belong, nor provide any evidence that Defendants intentionally discriminated against Gillard because of his membership in that class.  Indeed, the Estate does not address its equal protection claim in either of its response briefs to Defendants' motions for summary judgment and abandons the claim.  Summary judgment is warranted.

### D. Eighth Amendment Claim

The Estate alleges that the Officers violated Gillard's Eighth Amendment right to be free from cruel and unusual punishment by excessively striking and tasing Gillard and displaying deliberate indifference to his medical needs.  However, "the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences."  *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010).  Gillard was not a convicted criminal during the incident.  While he became a pretrial detainee upon being handcuffed, the Eighth Amendment does not apply to pretrial detainees.  *Watkins*, 273 F.3d at 685.  The Estate's Eighth Amendment claim fails.

### E. *Monell* Liability

The Estate claims that the Township of Bloomfield and the City of Troy (the "Municipalities") violated Gillard's Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983.  The complaint asserts that the Municipalities failed to properly train, supervise, and discipline their Officers, and also failed to hire Officers who did not pose a threat to the public.  In its response to Defendants' motions, the Estate argues only

31

that the Municipalities failed to properly train their Officers, thereby abandoning the other claims against the Municipalities.

"A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore*, 390 F.3d at 900. Viewing the facts most favorably to the Estate, the court has found only one possible constitutional violation: City of Troy Officer Morse may ultimately be proven to have violated Gillard's Fourth Amendment right by placing substantial pressure, for too long, on Gillard after he was fully subdued. Without deciding whether a constitutional violation in fact occurred, the court has also held that all Officers are entitled to qualified immunity on a claim that they used excessive force on Gillard when he was subdued simply by leaving him prone and by placing incidental pressure on his back, because those rights were not clearly established. Assuming that Bloomfield and Troy Officers did violate Gillard's constitutional right in doing so, the dispositive inquiry is whether the Municipalities failed to train their Officers on the proper use of force.

Municipalities may be liable under § 1983 for deprivations of civil rights when the deprivation resulted from the "execution of a policy or custom" of the municipality. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). "[A] plaintiff bringing a § 1983 claim against a municipality must therefore identify the policy or custom that caused her injury." *Ford v. Cnty. of Grand Traverse,* 535 F.3d 483, 495 (6th Cir. 2008). "A 'custom' for purposes of *Monell* liability must be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell*, 436 U.S. at 691); *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) ("[A]n act performed

32

pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.") (citations omitted).

A plaintiff may show that a municipality has an unlawful policy of inadequate training. *Ellis ex. rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). A municipality is liable for failing to train when the plaintiff proves: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Id.* Once a policy is identified, the plaintiff must "show that the municipal action was taken with the requisite degree of culpability." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla.*, 520 U.S. at 404. "The plaintiff must . . . demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* The municipality must have "intentionally" deprived the plaintiff of a federally protected right. *Id.* at 405. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410.

The Estate does not meet its burden to hold the Municipalities liable. First, no evidence is offered that shows the Municipalities failed to adequately train their Officers on the proper use of force. Even assuming that the training was insufficient, there is no evidence that the Municipalities acted with deliberate indifference. The Sixth Circuit "has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train." *Pendergrass*, 455 F.3d at 700. The first is the "'failure to provide adequate training in light of foreseeable consequences that could result from a lack of

33

instruction.'" *Id.* at 700-01 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).  The second "'is where the city fails to act in response to repeated complaints of constitutional violations by its officers.'" *Pendergrass*, 455 F.3d at 701 (quoting *Brown*, 172 F.3d at 931).  Deliberate indifference is established in these situations when "the need for more or different training is so obvious, and the inadequacy [is] so likely to result in the violation of constitutional rights." *City of Canton*, 489 U.S. at 390.  Neither situation is present in this case.  The Estate has not submitted evidence to prove that the Municipalities had an "obvious" need for additional training on the appropriate use force or that their training was "likely" to deprive suspects of their Fourth Amendment right.  The court will grant the Municipalities summary judgment on all of the Estate's claims alleging *Monell* liability.

## IV. CONCLUSION

Accordingly, IT IS ORDERED that the Township of Bloomfield Defendants' motion for summary judgment [Dkt. # 64] is GRANTED.

IT IS FURTHER ORDERED that the City of Troy Defendants' motion for summary judgment [Dkt. # 69] is GRANTED IN PART and DENIED IN PART.  The motion is DENIED only with respect to Plaintiff's claim that Defendant Sean Morse violated Jesus Gillard's Fourth Amendment right by kneeling on Gillard with excessive pressure and for an excessive length of time after Gillard was handcuffed and no longer resisting arrest.  The motion is GRANTED with respect to every other claim.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

34

Dated:  May 28, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 28, 2013, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522